**BERKOWITZ, LICHTSTEIN, KURITSKY,**
**GIASULLO & GROSS, LLC**
John C. Messina, Esq.
Evan Silagi, Esq.
75 Livingston Avenue
Roseland, New Jersey 07068
P: 973-325-7800 | F: 973-325-7930
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CYNTHIA HAM,<br><br>               Plaintiff,<br><br>     v.<br><br>NOVARTIS INTERNATIONAL AG,<br>NOVARITS PHARMACEUTICALS<br>CORPORATION, ELIZABETH McGEE and<br>SHEFALI KOTHARI, jointly, severally and<br>in the alternative,<br><br>               Defendants. | Civil No.: 2:23-cv-03503<br><br>*Civil Action*<br><br><br>**AMENDED COMPLAINT AND**<br>**DEMAND FOR JURY TRIAL** |

By way of complaint, plaintiff Cynthia Ham, by and through her attorneys, Berkowitz, Lichtstein, Kuritsky, Giasullo & Gross, LLC, says:

**NATURE OF THIS ACTION**

1.      This is an action to remedy retaliation in violation of the New Jersey Conscientious Employee Protection Act, N.J.S.A. 39:19-1, et seq. ("CEPA") and disability discrimination in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq*. ("NJLAD").

**PARTIES**

2.      At all times relevant hereto, Plaintiff Cynthia Ham ("Plaintiff" or "Ms. Ham"), was an employee of Defendant Novartis International AG as that term is defined by CEPA, N.J.S.A. 39:19-2(b), and the NJLAD, N.J.S.A. 10:5-5(f).

3.      At all times relevant hereto, Defendant Novartis International AG ("Novartis AG") was and still is a Swiss multinational pharmaceutical corporation based in Basel, Switzerland and is one of the largest pharmaceutical companies in the world.

4.      At all times relevant hereto, Defendant Novartis Pharmaceuticals Corporation ("NPC") was and still is a subsidiary of Novartis AG.  At all times relevant, Novartis AG and NPC acted in coordination, through their employees and agents, in connection with the unlawful and wrongful conduct alleged in making decisions effecting the employment of Plaintiff.  Due to their unity of interest and activity, and unless otherwise indicated, Novartis AG and NPC are collectively referred to "Novartis," "Defendant" or the "Company."

5.      At all times relevant hereto, NPC maintained and continues to maintain offices for the transaction of business at One Health Plaza, East Hanover, New Jersey 07936-1080.

6.      At all times relevant hereto, Novartis and NPC were Ms. Ham's employers as that term is defined by CEPA, N.J.S.A. 34:19-2(a), and the NJLAD, N.J.S.A. 10:5-5(e).

7.      At all times relevant hereto, Defendant Elizabeth McGee ("Ms. McGee") was NPC's U.S. General Counsel and was a member of NPC's "upper management" as that term is defined by Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 128-129 (1999).

8.      At all times relevant hereto, Ms. McGee was Ms. Ham's employer as that term is defined by CEPA, N.J.S.A. 34:19-2(a), and the NJLAD, N.J.S.A. 10:5-5(e).

9.      Ms. McGee resides at 207 Chestnut Street, Englewood, New Jersey 07631.

10.      At all times relevant hereto, Defendant Shefali Kothari ("Ms. Kothari") was NPC's U.S. Chief Compliance Officer and was a member of NPC's "upper management" as that term is defined by Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 128-129 (1999).

11.    At all times relevant hereto, Ms. Kothari was Ms. Ham's employer as that term is defined by CEPA, N.J.S.A. 34:19-2(a), and the NJLAD, N.J.S.A. 10:5-5(e).

12.    Ms. Kothari resides at 52 Granville Way, Basking Ridge, New Jersey 07920.

## FACTS COMMON TO ALL COUNTS

13.    Ms. Ham was hired by NPC on May 1, 2018 as the Ethics, Risk and Compliance Advisor for U.S. Patient Support Services and Managed Markets. Prior to joining NPC, Ms. Ham, an attorney, had over 20 years of experience as a Compliance and Legal professional with expertise in Patient Support Services and Managed Markets.

14.    NPC recruited Ms. Ham for her extensive experience in U.S. Healthcare Compliance to ensure compliance in the highly regulated area of Patient Support Services and Managed Markets, which had been identified by the Office of the Inspector General (OIG) and U.S. Department of Justice (DOJ) as needing more governance and Compliance oversight prior to Ms. Ham's employment with NPC.

15.    Ms. Ham was assigned to four leadership teams at NPC, including the Managed Markets Leadership Team, Patient Support Services Leadership Team (PSS), Ethics & Compliance Leadership Team, and U.S. Pharma Leadership Team (PLT).

16.    In one of Ms. Ham's first meetings with Ms. Kothari, which occurred on May 10, 2018, she [Ms. Kothari] advised Ms. Ham that because she [Ms. Kothari] was in Novartis' Legal Department, her communications were protected by the attorney-client privilege while Ms. Ham's communications were not because she [Ms. Ham], while a licensed attorney, was in Compliance.  In other words, Ms. Kothari told Ms. Ham not to create written communications regarding any alleged violations by Novartis because they would not be protected by the attorney-client privilege.

**Novartis is Subject to Heightened Federal Scrutiny Due to a History of Illegal Marketing.**

17.     Prior to Ms. Ham's employment, Novartis entered into a settlement with the U.S. Department of Justice pursuant to which Novartis agreed to pay in excess of $420 million to resolve civil and criminal claims of illegal off-label marketing and kickback schemes.  As per the announcement issued by the US Department of Justice:

> The civil settlement resolves four lawsuits filed under the *qui tam*, or whistleblower, provisions of the False Claims Act, which allow private citizens with knowledge of fraud to bring civil actions on behalf of the United States and share in any recovery. The four cases are: U.S. ex rel. Austin v. Novartis Pharmaceuticals Corporation; U.S. ex rel. McKee v. Novartis Pharmaceuticals Corporation; U.S. ex rel. Copeland v. Novartis Pharmaceuticals Corporation; and U.S. ex rel. Garrity v. Novartis Pharmaceuticals Corporation. As part of today's resolution, the whistleblowers, all former employees of Novartis, will receive payments totaling more than $25 million from the federal share of the civil recovery.
>
> "This settlement represents a landmark victory in our district's continuing battle against health care fraud. We intend to bring to justice any pharmaceutical company that attempts to cloud physicians' medical judgment through kickback practices and illegal promotional activities," said A. Brian Albritton, U.S. Attorney for the Middle District of Florida.

18.     As part of this settlement with the U.S. Department of Justice, Novartis also signed a Corporate Integrity Agreement ("CIA") pursuant to which the Office of the Inspector General ("OIG") would continue to monitor Novartis' conduct for compliance:

> Novartis also signed a Corporate Integrity Agreement (CIA) with the Department of Health and Human Services, Office of Inspector General (HHS-OIG). The company is subject to exclusion from Federal health care programs, including Medicare and Medicaid, for a material breach of this CIA and subject to monetary penalties for less significant breaches. Among other things, the CIA requires the board of directors (or a committee of the board) to annually review the company's compliance program with the help of an outside expert and certify its effectiveness; that certain senior executives annually certify that their departments or functional areas are compliant; that Novartis send doctors a letter notifying them about the settlement; and that the company posts on its website information about payments to doctors, such as honoraria, travel or lodging. The five-year

agreement further requires the implementation of a compliance program addressing promotional activities.

19.     On November 18, 2015, Novartis executed an Addendum to the 2010 CIA, which extended the government's monitoring of Novartis' activities for another five (5) years.  Mr. Bryant Aaron, NPC's Chief Compliance Officer and Ms. Ham's supervisor, executed the Addendum on behalf of the Company.  Id.

20.     In fact, the 2015 Addendum identified NPC's Patient Support Services programs as one of the many areas which required government monitoring.

**Ms. Ham Identifies Novartis' Cardiac Nurse Program as an Illegal Kick Back.**

21.     Shortly after she began her employment, Ms. Ham formed the reasonable objective belief that a key program launched by Novartis prior to her employment -- NPC's Patient Support Services Program a/k/a the Cardiac Nurse Program -- was an illegal kickback scheme in violation of the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7(b)(3).

22.     Pursuant to the Cardiac Nurse Program, Novartis hired licensed cardiac nurses to visit cardiac patients that had been prescribed Entresto and report back to the prescribing cardiologists, free of charge.  As a result, physicians prescribing Entresto were receiving free cardiac nursing services which were paid for by Novartis, providing an illegal incentive for physicians to prescribe Entresto.

23.     Entresto is a fixed-dose combination medication for use in heart failure manufactured and sold by Novartis.  In 2018, Entresto sales totaled $1.03 billion.  In 2021, Entresto sales totaled $949 million.  It is estimated that Entresto will have peak sales at $5 billion annually.

24.     The Cardiac Nurse Program was a multi-million-dollar program developed by Novartis to address lagging sales of Entresto behind expectations.  Accordingly, there was

significant pressure on Novartis' employees to implement and succeed with increasing sales of Entresto through the Cardiac Nurse Program.

25.    The program was approved by Ms. Kothari for Patient Support Services Group (PSS).  The program was launched by Matt Zeller, Head of PSS.  At the time Ms. Kothari approved the Cardiac Nurse Program, she reported directly to Ms. McGee.

**Ms. Ham Reports the Illegal Cardiac Nurse Program to the U.S. Chief Compliance Officer.**

26.    On July 2, 2018, Ms. Ham notified her manager, Bryant Aaron ("Mr. Aaron"), the U.S. Chief Compliance Officer, in writing that the Cardiac Nurse Program was an illegal Kick-Back scheme and in violation of the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7(b)(3) and therefore it should be reevaluated.  Ms. Ham attached five (5) separate documents to her email to support her conclusion.

27.    Ms. Ham's written objection to the Cardiac Nurse Program was protected conduct under CEPA, N.J.S.A. 34:19-3(a)(1); 3(a)(2); 3(c)(1); and 3(c)(2).

28.    In July 2018, Ms. Ham met with Mr. Aaron in his office and asked him for guidance on how to end or reform the illegal Cardiac Nurse Program.  Mr. Aaron told Ms. Ham "not to worry" and advised her that he would speak to Ms. Kothari and Ms. McGee about the Cardiac Nurse Program.  Ms. Ham again reiterated her reasonable objective belief that the Cardiac Nurse Program was illegal because Novartis' CIA was still in effect and the US Department of Justice was at the time conducting another investigation of Novartis' sales and marketing activities for allegations it offered kickbacks to doctors and illegal copayment support to boost its drugs' sales. Ms. Ham's conduct was protected conduct under CEPA, N.J.S.A. 34:19-3(a)(1)(2) and (c)(1)(2).

29.    After several weeks passed without a response, Ms. Ham asked Mr. Aaron if he had spoken to Ms. Kothari and Ms. McGee about the Cardiac Nurse Program.  Mr. Aaron advised Ms.

Ham that he had not spoken to Ms. Kothari and Ms. McGee about the program, and Ms. Ham told

Mr. Aaron that she would speak with Ms. Kothari herself.

**Ms. Ham Reports the Illegal Cardiac Nurse Program to Ms. Kothari.**

30.    Thereafter, Ms. Ham met with Ms. Kothari to discuss the Cardiac Nurse Program.

During their meeting, Ms. Ham again stressed her objection to the Cardiac Nurse Program and

explained the basis for her reasonable objective belief that the program was in violation of the

Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7(b)(3).

31.    In response, Ms. Kothari became defensive and was unable to articulate how the

Cardiac Nurse Program could be compliant with the Federal Anti-Kickback statute.  Initially, Ms.

Kothari blamed another NPC in-house counsel for approving the Cardiac Nurse Program, claiming

that she had not worked on the program even though Ms. Kothari's signature was on the approval

document.

32.    Later that night, Ms. Kothari sent Ms. Ham an email claiming that outside counsel

had reviewed and approved the Cardiac Nurse Program.  Ms. Ham requested to see the approval

opinion to understand how the program could be compliant with the law.  Ms. Kothari did not

provide the opinion or provide any reasoning as to how the program could be construed as legal.

33.    Thereafter, Ms. Kothari, Ms. McGee, Mr. Aaron and others had a number of

meetings about the Cardiac Nurse Program.  Ms. Ham was excluded from those discussions, which

was surprising as she had identified the illegality of the Cardiac Nurse Program.  Ms. Ham also

began to be excluded from other meetings and discussions that were material to her ability to

perform her job.  Additionally, Ms. Ham observed that she was avoided and shunned by key

managers and members of leadership, including Ms. McGee.

34.     Ms. Ham met with Mr. Aaron again.  Ms. Ham reiterated her prior opposition to the Cardiac Nurse Program and expressed concerns that her whistleblowing had damaged her career at Novartis.  Ms. Ham specifically told Mr. Aaron that she hoped that she had done the right thing by identifying the non-compliance of the Cardiac Nurse Program and that doing so would not harm her career at Novartis since it seemed that many people were not happy that she had objected to the program.

35.     Mr. Aaron did not allay her concerns, but instead told her that "... a lot of people have egg on their faces (referring to Ms. Kothari, Ms. McGee and Mr. Zeller) so they are pissed." Thus, Mr. Aaron confirmed that Novartis' "upper management" was aware of Ms. Ham's whistleblowing and was angry at her for having engaged in protected conduct under the statute.

36.     Following Ms. Ham's protected complaints, she participated in a meeting with the commercial head of the Cardiac Nurse Program, Mr. Zeller.  Unbeknownst to Ms. Ham, Ms. Kothari (and potentially others) had informed Mr. Zeller of Ms. Ham's concerns that the program was illegal and needed to be reformed or ended.

37.     Mr. Zeller was furious at Ms. Ham.  He yelled and berated her in an outrageous manner, using profanity, to the point that his face turned red and a vein was bulging in his forehead. Mr. Zeller confirmed that "Shefali told me that you are trying to shut down the program" and threatened "how dare you?"  Mr. Zeller was not calmed when Ms. Ham told him that she was simply performing her job, which required her to identify and report illegal programs.

38.     Mr. Zeller's treatment of Ms. Ham was unprecedented in her professional career. Ms. Ham was extremely shaken and distressed following that meeting.

39.     Due to the actions of Novartis' leadership, Ms. Ham developed significant anxiety that she had been branded as an "enemy" by Novartis' leadership for raising a meritorious concern

about the illegality of the Cardiac Nurse Program. Ms. Ham was threatened and humiliated by Novartis' treatment of her. Ms. Ham began to fear that her career was in danger.

**Novartis Terminates the Cardiac Nurse Program Following Ms. Ham's Complaints.**

40.    Thereafter, Ms. Kothari sent an announcement terminating the Cardiac Nurse Program citing "changes in the current government enforcement environment" as the reason for the program's termination. There had been no intervening change in government enforcement because the Cardiac Nurse Program was launched after the government had issued its relevant enforcements and guidance. In other words, the Cardiac Nurse Program was illegal from its inception and Ms. Kothari's stated reason for terminating the program was false.

**Novartis Reassigns Ms. Ham to a Dead-End Assignment After Her Protected Activity.**

41.    Shortly thereafter, the Defendants began to retaliate against Ms. Ham for reporting and opposing the Cardiac Nurse Program. First, Ms. Ham was removed from her role as the Compliance Advisor for PSS and Managed Markets and was moved to support the Ophthalmology Franchise's legacy products. The assignment specifically excluded Beovu which was Novartis' newest Ophthalmology drug. Patrick Mooney, the then-Vice President and Head of Novartis Ophthalmics and others told Ms. Ham that the part of the Ophthalmology Franchise, i.e., legacy products, to which she had been assigned was going to be dissolved shortly, which would give Novartis a reason to terminate her employment.

42.    Ms. Ham was also removed from the PSS Leadership team and the Managed Markets Leadership team. In addition, Ms. Ham was prohibited from sitting on the Ophthalmology Franchise Leadership team.

43.    Prior to her removal from PSS and Managed Markets, Ms. Ham approached Mr. Aaron and expressed her concern that she was being punished for identifying the non-compliant

9

Cardiac Nurse Program.  Ms. Ham told Mr. Aaron that she had been hired specifically to work on PSS programs and Managed Markets matters, and that by removing her from that role sent the wrong message to the rest of the Compliance Department – if you speak up, then you will be punished.

44.    Mr. Aaron and David Britt, HR Manager, had to rearrange the department and company to remove Ms. Ham from supporting PSS and Managed Markets. Just before her removal, NPC had hired LoriBeth Westbrook as a junior Compliance Associate. Just prior to Ms. Westbrook's start date, Mr. Aaron and Mr. Britt reassigned Ms. Ham to support the Entresto/Cardio and Respiratory Franchises. Then, they designated Mike Rivas from the Oncology Business Unit, who had no prior experience in PSS, to support the Patient Support Services and Managed Markets, the role Ms. Ham had just been removed from after whistleblowing.  In addition, Mr. Aaron and Mr. Britt moved Marty Putenis, the Compliance Advisor from Entresto/Cardio Franchise to support Beovu.

45.    Thus, the Defendants retaliated against Ms. Ham in violation of CEPA shortly after she had engaged in protected conduct under the statute.

**Ms. Ham is Again Berated and Humiliated After Identifying Illegal Sales Guidance.**

46.    In or about May 2019, in the course of her job responsibilities, Ms. Ham reviewed a slide deck prepared by the Ophthalmology Marketing team entitled "Sales Guidance on Interactions with Pharmacies," an area highly regulated by the government and specifically addressed by the 2015 CIA.  This slide deck was to be used to train Novartis' sales employees.

47.    An employee in Novartis' legal department, Ms. Jennifer DeStefano, had previously reviewed and commented on the slide deck.  During her separate review, Ms. Ham redlined certain materials that she identified as violating OIG guidelines, but which had not been

identified by the legal team during its review.  Ms. Ham also opposed a recommendation by the legal department to rename the document by omitting the word "Sales" so that the non-compliant slide deck would not be identified in response to DOJ/OIG investigation or subpoena.  Novartis' plan was a clear intent to circumvent the CIAs and United States government oversight. Ms. Ham's opposition to the slide deck was protected conduct under CEPA.

48.     Thereafter, on June 5, 2019, Ms. Ham was called to an in-person meeting with Ms. McGee, Mr. Aaron and Ms. DeStefano.  Ms. McGee did not provide any agenda in advance of the meeting.  When the meeting began, Ms. McGee forcefully reprimanded Ms. Ham for "speaking up" and "questioning" the advice of the Legal Department.  Ms. Ham asked Ms. McGee for examples of any alleged misconduct, and Ms. McGee specifically identified Ms. Ham's prior whistleblowing with respect to the Cardiac Nurse Program.  Thus, Ms. McGee confirmed that she was angry that Ms. Ham had engaged in protected conduct under CEPA.

49.     During the meeting, while berating Ms. Ham, Ms. McGee made it clear that Ms. Ham should not voice any objections to Novartis' actions but should instead "leave the legal decision to Legal."  Thus, Ms. McGee directed Ms. Ham not to object to any Novartis action which she reasonably believed to be illegal.  Ms. Ham objected to Ms. McGee's directive that she refrain from whistle-blowing.  This was also protected conduct under CEPA.

50.     Ms. McGee cut the meeting short and, in an effort to humiliate Ms. Ham, demanded that Ms. Ham apologize to Ms. DeStefano for questioning her slides.  Ms. Ham, who was fearful of further retaliation and termination, was forced to apologize to Ms. DeStefano.

51.     Mr. Aaron hardly spoke during the meeting and appeared to be fearful of Ms. McGee.  After the meeting, Ms. Ham followed Mr. Aaron into his office and objected to Ms. McGee's comments and conduct.  Ms. Ham told Mr. Aaron that Ms. McGee was creating a toxic

culture where no one, not even Compliance, can speak up if he or she reasonably believed that Novartis' legal advice was illegal or just plain wrong. Mr. Aaron agreed with Ms. Ham and stated that, "it's whatever Liz [McGee] and Legal says that goes here."

52.    Ms. Ham was humiliated and distressed following that meeting.

**Ms. Ham Successfully Leads the Multi-Billion Dollar Acquisition of Xiidra.**

53.    On July 1, 2019, Ms. Ham successfully led the acquisition, integration and launch of Xiidra, a $5.3 billion deal, for the U.S. Ethics & Compliance team ("Xiidra Project"). Xiidra had been estimated to be a blockbuster $1.2 billion Ophthalmology Product for Novartis. The Xiidra Project was the largest acquisition for Novartis in 2019.

54.    The Xiidra deal was not foreseen at the time Ms. Ham was relegated to support the legacy Ophthalmic products that were slotted to dissolve.

55.    Ms. Ham led a team of nine (9) Compliance workstreams with over thirty (30) associates in the Ethics & Compliance Department for the integration of Xiidra. Ms. Ham was praised by the U.S. Ophthalmology Franchise Head, the U.S. and Global Xiidra Project Leads, and the U.S. Xiidra Project team for her exemplary contribution to the acquisition, integration, and launch.

56.    Ms. Ham's leadership of the Xiidra Project for Ethics & Compliance was so integral to its success that Mr. Aaron requested that she cancel an upcoming family vacation so that she could complete the closing of the Xiidra acquisition. Ms. Ham cancelled her pre-planned family vacation at Mr. Aaron's request.

**Ms. Ham Opposes Novartis' Plan to Close the Xiidra Deal without Completing Compliance Review.**

57.    On June 5, 2019, less than three (3) weeks prior to the closing date of the Xiidra acquisition, Ms. Ham and others learned that the PSS ("Patient Support Services") team led by

Dane Hartung and Maria Kirsch failed to conduct and initiate due diligence on the numerous PSS programs and third-party contracts that would be transferred to Novartis at closing. Because of their failure to timely conduct due diligence, many other workstreams would be impacted as well as putting at risk meeting the established acquisition closing date of July 1, 2019.

58.    On June 13, 2019, during the acquisition meeting held in Boston, Massachusetts at Takeda Pharmaceutical's headquarters, PSS, led by Mr. Hartung and Ms. Kirsch, scheduled an urgent internal meeting of approximately eighteen (18) Novartis associates during which they advised that PSS would not review the third-party contracts and those contracts would be duly assigned to Novartis at closing without review.

59.    Ms. Ham and others on the Compliance team and the Business (Ophthalmology Franchise Project leader) recommended that PSS should at least review the third-party contracts and associated programs to ensure operational compliance. Despite Ms. Ham's recommendations and the participation of both Lee Stoller and Jennifer DeStefano (Novartis' legal counsel), no action was taken to review the third-party contracts and programs.

**Ms. Ham Opposes Novartis' Plan to Knowingly Assume the Illegal "Pillpack Agreement."**

60.    On June 18, 2019, only seven (7) days before the closing of the Xiidra acquisition, it was discovered that a Home-Delivery/Mail-Order Pharmacy program ("Pillpack Agreement") that was to be transferred to Novartis' PSS contained illegal discount arrangements, kickback, patient steering and hosts of other illegalities. Ms. Ham promptly raised her concerns about the transfer of an illegal discount arrangement to the Ophthalmology Business and Project lead. This was protected conduct under CEPA.

61.    The PSS team, Mr. Hartung and Ms. Kirsch, and Novartis' Legal Counsels, Ms. Kothari, Mr. Stoller and Ms. DeStefano, were angry that Ms. Ham had objected to the illegal

Pillpack Agreement. As a result, the Defendants retaliated against Ms. Ham by excluding her from further internal meetings related to the Pillpack Agreement.

62. Despite this retaliation, on June 19, 2019, Constantina Poga, the Xiidra Acquisition U.S. Project Lead, sent an email to Mr. Aaron and Mr. Mooney praising Ms. Ham and thanking Mr. Aaron for assigning her to the Xiidra acquisition.

63. On June 24, 2019, five (5) days before the closing of the Xiidra acquisition, Mr. Mooney scheduled an urgent meeting to discuss the illegal Pillpack Agreement. During this meeting, Ms. Ham again engaged in protected conduct by objecting to the illegal Pillpack Agreement. Ms. Kothari was present at this meeting and witnessed Ms. Ham's comments. Ms. Kothari did not object to the illegal Pillpack Agreement.

64. On June 25, 2019, Ms. Ham was informed that Novartis planned to go forward with the illegal assignment of the Pillpack Agreement. Ms. Ham again objected to the Pillpack Agreement by sending an email to Ms. DeStefano, Mr. Stoller and others, requesting that the Pillpack Agreement be removed from the assigned contracts list because the agreement was illegal.

65. On June 26, 2019, Ms. Kothari terminated the Pillpack Agreement – thus confirming Ms. Ham's reasonable objective belief about the illegality of the Pillpack Agreement.

**Ms. Ham is Subject to a First Bogus "Investigation" for Opposing the Pillpack Agreement.**

66. On June 27, 2019, Mr. Aaron told Ms. Ham that she was being investigated by Human Resources based on complaints made by PSS and others in the Legal Department about Ms. Ham's alleged behavior during the June 13, 2019 meeting in Takeda's Boston offices. In other words, Novartis was investigating Ms. Ham for her "behavior" in objecting to the illegalities arising from aspects of the Xiidra acquisition.

67.     Mr. Aaron advised Ms. Ham that Pedro Menendez-Manjon, HR business partner for Ethics & Compliance, would be conducting the HR investigation.  Ms. Ham advised Mr. Aaron that she believed that the HR investigation was an act of retaliation against her for her objection to the illegal Pillpack Agreement.

68.     Days later, on July 1, 2019, the Xiidra acquisition successfully closed without the Pillpack Agreement.

69.     On July 23, 2019, Mr. Menendez-Manjon reported that his investigation did not substantiate any misconduct on Ms. Ham's part.

70.     At that time Mr. Aaron admitted to Ms. Ham that Ms. McGee had instigated the bogus HR investigation.

**Despite Excellent Performance, Ms. Ham is Warned by Novartis' Vice President to "Be Careful" Because Ms. McGee has "Powerful Friends."**

71.     On September 5, 2019, Ms. Ham met with Mr. Aaron for her mid-year review. During this review, Mr. Aaron praised Ms. Ham for her efforts during the Xiidra acquisition and did not raise any performance deficiencies.

72.     The next day, September 6, 2019, Ms. Ham met with Vice President, Mr. Mooney. During the meeting, Mr. Mooney told Ms. Ham that Ms. McGee continued to have issues with Ms. Ham because she had identified and objected to various illegal actions of the Company.  Mr. Mooney also told Ms. Ham that he had defended Ms. Ham to Ms. McGee during heated discussions.  Mr. Mooney also advised Ms. Ham that both Ms. McGee and Ms. Kothari were still angry at Ms. Ham for her objection to the Cardiac Nurse Program.

73.     Finally, Mr. Mooney warned Ms. Ham to "be careful" because Ms. McGee has "powerful friends at Novartis."

74.     Mr. Mooney's warnings were extremely distressing to Ms. Ham.

**Ms. Ham is Excluded from a Prestigious Speaking Engagement About the Xiidra Deal.**

75.    On or about October 2, 2019, Ms. Ham learned that a colleague, Michael Ace, Novartis' Executive Director of Ethics and Compliance, had been assigned to present about the Xiidra acquisition at Novartis' global headquarters in Basel, Switzerland, at the Ethics, Risk, Compliance Forum.  The speaking assignment was a significant honor with important career and promotional implications because the Xiidra acquisition was being recognized as one of Novartis' most significant and successful projects for the year.

76.    Ms. Ham was extremely upset and humiliated to be snubbed for the assignment in favor of Mr. Ace – who had not led the project.  Upon information and belief, Ms. Ham was excluded from the speaking engagement because of her protected activity as set forth above.

77.    Ms. Ham called Mr. Aaron to protest the decision to assign the prestigious speaking engagement to Mr. Ace.  Mr. Aaron told Ms. Ham not to worry because he was going to "take care" of her with her upcoming performance rating.  Ms. Ham told Mr. Aaron that she expected a performance rating of no less than 3.3 because she had successfully completed an acquisition and a new launch of a product in the same year.  Mr. Aaron responded, "Of Course."

**Ms. Ham is Subjected to a Second Bogus "Investigation."**

78.    In early October 2019, Mr. Menendez-Manjon told Ms. Ham that he had been tasked with yet another investigation of Ms. Ham, arising out of her comments during a Governance Board meeting/telephone conference with the Legal and Business Departments.  Ms. Ham had done nothing during the conference call to warrant any internal investigation.  This was yet another act of retaliation in violation of CEPA.

79.    On October 21, 2019, Ms. Ham scheduled a call with Alison Manhoff, the Legal Counsel to Ophthalmology Franchise, so that she [Ms. Ham] could understand what she allegedly

said to cause a second HR investigation into her conduct.  During this call, Ms. Manhoff admitted that Ms. McGee had reported Ms. Ham to HR for using the word "handcuff" during the Governance Board meeting/telephone conference.  Thus, Ms. McGee continued to retaliate against Ms. Ham for her protected conduct under CEPA.

80.    Again, Ms. Ham was cleared of any wrongdoing as HR could not substantiate any of Ms. McGee's retaliatory claims.

**Ms. Ham is Falsely Accused of a Potential Compliance Issue Related to the "Sample Portal" To Set Up Further Retaliatory Disciplinary Actions.**

81.    On February 3, 2020, Ms. Ham met with Mr. Aaron to discuss her upcoming 2019 Year-End Performance Review.  During the meeting, Mr. Aaron praised Ms. Ham's efforts on the Xiidra acquisition, stating that she did a "great job" and that the acquisition could not have happened without her.  During this conversation, Mr. Aaron did not raise any alleged performance deficiency with Ms. Ham.

82.    On February 12, 2020, Ms. Ham received an urgent message from Ms. DeStefano asking her to schedule a call.  Ms. DeStefano acted as if she was panicked about a sample portal which allowed eligible Health Care Providers ("HCPs") to obtain product samples of prescription drugs through an on-line channel.  Ms. Ham joined the call – also on the call was Adam Subverbi, Novartis' Legal Counsel.

83.    During the call, Ms. DeStefano questioned Ms. Ham, in an accusatory tone, about whether she had approved of product samples being made available to high prescribing physicians, thereby asserting that Ms. Ham had approved an illegal kickback.  Ms. Ham truthfully told Ms. DeStefano that this was the first she was hearing about the issue, but she would investigate and report back.

84.     Immediately after the call ended, Ms. Ham spoke with the sample portal project owner and determined that the system was in compliance with federal guidelines and that samples were being properly processed through sample portal operations.

85.     On February 18, 2020, Ms. Ham scheduled an in-person meeting with all of the relevant teams in order to address and allay Ms. DeStefano's concerns regarding the sample portal operations and the compliance controls.  The teams in attendance included the business/franchise team, CIC operations, sampling operations team, and commercial accelerations team.  During the meeting, the teams outlined the entire sample portal process and controls on the whiteboard so that Ms. DeStefano could learn the process and put to rest any compliance concerns.

86.     On February 20, 2020, Ms. Ham conducted a telephone call with Ms. DeStefano, Ms. Manhoff and Shawn Laverty, Compliance Rotation Associate, to discuss how the teams could better collaborate in the future.  During the call, Ms. DeStefano admitted that she was the one who had approved the sample portal through the Promotional Review Committee without fully understanding the compliance criteria for its operations.  During this call, both Ms. DeStefano and Ms. Manhoff were very defensive and argumentative. Ms. DeStefano never apologized for interrogating Ms. Ham and falsely accusing her [Ms. Ham] of approving an illegal kickback program.

87.     On February 25, 2020, Mr. Aaron emailed Ms. Ham regarding the sample portal issue.  Ms. Ham spoke with Mr. Aaron and explained the sample portal issue to him and noted that the sample portal had almost been shut down because the Legal Department, and specifically Ms. DeStefano, did not understand the compliance issues and incorrectly concluded that the sample portal violated the Anti-Kickback laws. Ms. Ham explained that Ms. DeStefano erroneously blamed her [Ms. Ham] for approving the sample portal program.

88.     Novartis knew that Ms. Ham was not responsible for the "Sample Portal" approval (it had been approved by Ms. DeStefano) and made knowingly false allegations against Ms. Ham to support anticipated further discipline against her and thereby "paper" her planned termination. This plan materialized in the subsequent issuance of a bogus final warning "Conduct Memo" assessed against Ms. Ham in violation of Novartis policy and procedure, as discussed below.

**Ms. Ham Receives a Reduced Performance Evaluation in Retaliation for Her Protected Activity.**

89.     On February 24, 2020, Ms. Ham met with Mr. Aaron and Mr. Menendez-Manjon regarding her 2019 Year-End Performance review.  Mr. Aaron advised Ms. Ham that she would be receiving a performance rating of 2.2, or "Meets Expectations."  Mr. Aaron had previously told Ms. Ham that she would receive a performance rating of 3.3, or "Exceeds Expectations," due to her exemplary performance and outstanding achievement in leading the Xiidra acquisition.

90.     Mr. Aaron falsely claimed that Ms. Ham was receiving this rating because she had failed to "collaborate" with her peers.  Contrary to Mr. Aaron's claim that Ms. Ham had not collaborated with her peers in 2019, Ms. Ham's 360 peer reviews reflected that Ms. Ham had received the highest ratings from her peers for collaboration and leadership.

91.     Mr. Aaron's stated basis for lowering Ms. Ham's performance evaluation was a direct reference to Ms. Ham's protected activity in identifying illegal conduct by Novartis and the hostile response that she had received.

92.     Ms. Ham advised Mr. Aaron that this 2019 performance rating was an act of retaliation because she [Ms. Ham] had objected several times during the year to conduct which she reasonably had believed was illegal. During this meeting, Mr. Aaron revealed that Ms. McGee was behind giving Ms. Ham a low rating.  Ms. Ham further stated that she would be appealing this rating.

93.    On February 28, 2020, Ms. Ham filed an appeal of her 2019 Year-End Performance Review.  In her appeal, Ms. Ham noted that the review was an act of retaliation against her for having objected to various illegalities she observed during 2019.

**Ms. Ham is Subject to a Third Bogus "Investigation".**

94.    On February 23, 2020, David Britt, Executive Director of Novartis People & Organization, who supports Ms. McGee and her legal team, filed a complaint with Novartis' Business Practice Office, also known as Novartis' Speak Up Office, against Ms. Ham.  This complaint was assigned Case Number: 10887.

95.    In this complaint, Mr. Britt alleged that during a February 20, 2020 meeting, he [Mr. Britt] learned that there was an ongoing illegal kickback scheme/program regarding the Ophthalmology Sampling Program which had been approved by someone in Compliance Ophthalmology.

96.    On March 5, 2020, the BPO complaint filed by Mr. Britt was assigned to Ms. Ham, the Compliance Advisor for Ophthalmology, for investigation as per Novartis policy.

97.    On March 23, 2020, Ms. Ham conducted a call with Mr. Britt to interview him about the BPO complaint that he had filed.  Mr. Laverty was also on the phone.  During the call, Mr. Britt was nervous and continued to claim that there was a "conflict of interest," but could not articulate what the alleged "conflict of interest" was.  Mr. Britt refused to provide information regarding his BPO complaint and abruptly ended the call.

98.    Approximately 15 minutes after Mr. Britt ended the call, Ms. Ham received an email from Christine Rzasa, Head of Compliance Investigations, in which Ms. Rzasa told Ms. Ham that she had spoken to Mr. Britt and that she was reassigning the BPO complaint to another

associate to investigate.  This reassignment was not in compliance with Novartis policy, which normally assigned BPO complaints to the unit Compliance Officer for investigation.

99.    Ms. Ham both texted and emailed Ms. Rzasa about this BPO complaint, noting that, among other things, she [Ms. Ham] had been excluded from a call with Mr. Aaron, Mr. Britt, and the Ophthalmics Legal Business Partners, Ms. DeStefano and Ms. Manhoff, where the sampling issues were discussed which later resulting in the BPO complaint.  Ms. Rzasa responded by email stating that Ms. Ham would be contacted during the investigation, but she [Ms. Ham] was never contacted.

**Novartis Issues Ms. Ham a Bogus "Conduct Memo" Without Completing its Required Due Process Because Novartis is in Negotiations with the DOJ Regarding Other Illegal Marketing Activities and Needs to Manufacture "Documentation" to Justify Terminating Ms. Ham.**

100.    On March 12, 2020, Ms. Ham met with Mr. Aaron and Mr. Menendez-Manjon in Mr. Aaron's office.  Mr. Aaron presented Ms. Ham with a two (2) page Conduct Memo dated March 6, 2020, which noted that it was Ms. Ham's "final warning" before termination.

101.    Under Novartis' policy, a "final warning" Conduct Memo is a serious personnel action, which is only undertaken after prior incidents of discipline and with advance notice and an opportunity to address any alleged wrong-doing prior to a "final warning" being issued to the employee.

102.    Novartis' assessment of a "final warning" Conduct Memo to Ms. Ham completely violated the required practice and policy, including the fact that there had been no prior disciplines against Ms. Ham, she had no notice that discipline was being considered, and she was given no opportunity to address the false allegations before the "final warning" conduct memo was issued.

103.    Substantively, the Conduct Memo was riddled with false allegations such as blaming Ms. Ham for the sample portal issue.

21

104.    Ms. Ham asked Mr. Menendez-Manjon whether he had spoken with Mr. Laverty regarding the allegations surrounding the sample portal issue because he [Mr. Laverty] had been present in all sample portal meetings and calls.  Mr. Menendez-Manjon became very angry and defensive, and refused to permit Ms. Ham to call Mr. Laverty.

105.    Ms. Ham was physically and mentally shaken to her core by the unprecedented and sudden issuance of a "final warning" with no prior notice to her and with no factual basis.

106.    As a senior compliance employee, Ms. Ham had participated in the assessment of Conduct Memos to other employees and was well aware that Novartis had intentionally deviated from the required process afforded to all other employees to place her job into jeopardy without any due process.

107.    Upon information and belief, the Conduct Memo was manufactured by Novartis without due process to "paper" Ms. Ham with discipline to support a planned termination of her employment.  At that time, Novartis was in negotiations with the DOJ and involved in other legal proceedings regarding other illegal marketing activities.  Under the CIA, Novartis was required to report the termination of employees to the monitoring authorities.  Novartis knew that the sudden unsupported termination of Ms. Ham, a senior compliance professional, in that environment would raise red flags and, given Ms. Ham's whistleblowing activities, be detrimental to Novartis' positions in those matters.

108.    Ms. Ham advised both Mr. Aaron and Mr. Menendez-Manjon that the Conduct Memo was yet another act of retaliation.

**Ms. Ham Reports Retaliation to Novartis' President of U.S. Pharmaceuticals.**

109.    On April 14, 2020, Ms. Ham participated in a video call with Victor Bulto, President of U.S. Pharmaceuticals, in which she explained the retaliation that she was experiencing

for having objected to illegal Novartis programs, such as the Cardiac Nurse Program, Pillpack Agreement and Sales Guidance.  Ms. Ham also advised Mr. Bulto about the devastating false final warning Conduct Memo which she had received as well as trumped-up BPO complaint filed against her by Mr. Britt.  Mr. Bulto advised Ms. Ham that he would investigate her complaints and get back to her – but he never did.  Instead, approximately one (1) week later Mr. Bulto sent Ms. Ham an email dismissing her retaliation claims.

**Ms. Ham Develops Brain Cancer in the Midst of Novartis' Campaign of Retaliation Designed to Diminish and End Her Career.**

110.    In late April 2020, Stephanie DiCicco, Associate Director HR Business Partner, was assigned to handle Ms. Ham's appeal of her 2019 Year-End Performance Review.  Ms. Ham spoke with Ms. DiCicco on April 21, 2020.  On June 1, 2020, Ms. Ham sent Ms. DiCiccio an email in which she [Ms. Ham] provided Ms. DiCicco with additional documents and information in support of her appeal.

111.    Shortly after sending this email, Ms. Ham experienced a seizure on the left side of her face and was rushed to the emergency neurosurgery center at Overlook Hospital in Summit, New Jersey for an emergency resection of a brain tumor.

112.    A biopsy of the brain tumor revealed malignancy and Ms. Ham had to undergo high-dose intensive chemotherapy treatment for brain cancer.  The chemotherapy treatments were so toxic that Ms. Ham had to be treated as an in-patient for one week at a time, every other week.  During the weeks when Ms. Ham received treatments at home, she had to take oral chemotherapy treatments along with rescue injections that her husband administered.

113.    Eight months later, Ms. Ham was diagnosed with ocular cancer for which she had to undergo further chemotherapy treatments.

**Novartis Pays $642 Million to Resolve Claims of Illegal Kickbacks.**

114.    On June 30, 2020, Novartis agreed to pay in excess of $642 million to settle additional claims of illegal kickbacks to physicians and as part of the settlement and entered into yet another CIA with the OIG.  Again, Mr. Bryant executed the CIA on behalf of Novartis. According to the Press Release issued by the US Department of Justice:

> "According to the allegations in today's settlement, Novartis coordinated with three co-pay foundations to funnel money through the foundations to patients taking Novartis' own drugs," said U.S. Attorney Andrew E. Lelling for the District of Massachusetts.  "As a result, the Novartis' conduct was not 'charitable,' but rather functioned as a kickback scheme that undermined the structure of the Medicare program and illegally subsidized the high costs of Novartis's drugs at the expense of American taxpayers.  At the same time, we recognize that Novartis' current management has taken constructive steps to address the government's concerns with the company's prior relationships with co-pay foundations."
>
> ***
>
> "For more than a decade, Novartis spent hundreds of millions of dollars on so-called speaker programs, including speaking fees, exorbitant meals, and top-shelf alcohol that were nothing more than bribes to get doctors across the country to prescribe Novartis's drugs," said Acting U.S. Attorney Audrey Strauss for the Southern District of New York.  "Giving these cash payments and other lavish goodies interferes with the duty of doctors to choose the best treatment for their patients and increase drug costs for everyone.  This office will continue to be vigilant in cracking down on kickbacks, however they may be dressed up, throughout the pharmaceutical industry."
>
> ***
>
> Contemporaneous with the settlement of the FCA claims in these matters, Novartis entered into a corporate integrity agreement (CIA) with the Department of Health and Human Services Office of Inspector General (HHS-OIG).  The five-year CIA addresses the conduct at issue in both matters.  Among other things, the CIA requires Novartis to significantly reduce the number of paid speaker programs and the amounts spent on such programs.  Under the CIA, Novartis speaker programs may only occur under limited circumstances and in a virtual format.  In addition, the CIA requires Novartis to implement measures designed to promote independence from any patient assistance programs to which it contributes. The CIA also requires multi-faceted monitoring of Novartis's operations and obligates company executives and Board members to certify about compliance.

**Novartis Threatens Ms. Ham with Termination and Fails to Engage in a Good Faith Interactive Process.**

115.    As a result of her cancer and treatment, Ms. Ham went out of work and did not return to work until September 7, 2021.

116.    During her recovery, Ms. Ham's husband, Greg Campbell ("Mr. Campbell"), was her primary caretaker and communicated extensively with Novartis, Memorial Sloan Kettering Cancer Center, and the many doctors and specialists treating her.

117.    On November 23, 2020, Ms. Ham was notified that her medical leave with Novartis was approved through November 2021.  This approval was also confirmed and communicated to Mr. Aaron, Mr. Menendez-Manjon and Debra Bloodgood, Medical Leave Coordinator.

118.    On February 8, 2021, Mr. Campbell requested a video conference with Novartis to provide an update on Ms. Ham's condition and to discuss her return-to-work accommodations.

119.    On February 25, 2021, Mr. Campbell conducted a video conference with Mr. Menendez-Manjon and Ms. Bloodgood to provide them with an update on Ms. Ham's condition and to discuss her return-to-work accommodations.   Both Mr. Menendez-Manjon and Ms. Bloodgood agreed to coordinate Ms. Ham's return to work accommodations and provide that information to Mr. Campbell.  Thereafter, both Mr. Menendez-Manjon and Ms. Bloodgood failed to provide Mr. Campbell with any information about Ms. Ham's return to work.

120.    On April 24, 2021, Novartis sent Ms. Ham a letter notifying her that her employment would be terminated if she did not return to work by June 1, 2021.

121.    On May 3, 2021, Mr. Campbell responded to this letter by emailing Mr. Menendez-Manjon.  In his email, Mr. Campbell advised Mr. Menendez-Manjon that they (he and Ms. Ham) were shocked by this letter because, in part, Novartis had not provided any information with

respect to Ms. Ham's return-to-work accommodations and because her medical leave had been previously approved through November, 2021.

122.     On May 6, 2021, Mr. Menendez-Manjon responded by emailing Mr. Campbell in which he [Mr. Menendez-Manjon] mandated that there could be no further verbal communications between Ms. Ham and Novartis and that all further communications must be in writing.  There was no legitimate reason for this email and position by Novartis.

123.     On May 6, 2021, Mr. Menendez-Manjon attempted to cure the company's failure to engage in the interactive process by emailing two (2) medical questionnaires to Ms. Ham. However, Mr. Menendez-Manjon provided Ms. Ham with only nine (9) business days to have her treating doctors complete and return the forms to Novartis.  These forms required detailed information from Ms. Ham's treating doctors about her medical clearance and accommodations needed to permit her to return to work.  The forms specifically noted that Ms. Ham's role was allegedly so critical that it would cause "undue hardship on the company" if she did not return to work by June 1, 2021.

124.     Over the next nine (9) days, Ms. Ham and Mr. Campbell scrambled to complete the forms while Ms. Ham was hospitalized and still receiving treatment.  On May 20, 2021, Ms. Ham returned the completed questionnaire forms to Novartis and, as per her Neuro-Oncologist, Dr. Grommes, Ms. Ham was cleared to return to work with accommodations on June 1, 2021.

125.     Specifically, Dr. Grommes indicated that Ms. Ham required the following accommodations: remote working; reduced schedule; ramp-up period; supplemental breaks; supplemental equipment (home-work station with monitor, computer, printer).  As discussed *infra*, Novartis did not provide Ms. Ham with any of the requested accommodations.

**Novartis Fails to Return Ms. Ham to Work with Accommodations.**

126.    On June 1, 2021, Ms. Ham was on stand-by and ready to start work, but she had received no information from Novartis about her return to work or her workplace accommodations despite Novartis' prior claim that it was critical that she return to work on June 1, 2021.  Ms. Ham did not work that day.

127.    On June 4, 2021, three days after Novartis' mandated return to work date, Ms. Ham received an email from a Novartis HR associate which stated that her medical leave had been extended to August 30, 2021.  The email provided no further explanation and no information about Ms. Ham's return-to-work accommodations.

128.    On July 17, 2021, Novartis altered its prior directive of no oral communications with Ms. Ham and/or her husband.  On this date, Ms. Ham and Mr. Campbell spoke with Mr. Menendez-Manjon and Mr. Yatin Nayampally, HR business partner for Ethics and Compliance. During the call, Mr. Menendez-Manjon and Mr. Nayampally admitted that Novartis' July medical questionnaire was redundant to the prior May 20, 2021 medical questionnaire and therefore unnecessary.

129.    The very next day, Novartis reversed its own decision with respect to the July medical questionnaire.  On July 19, 2021, Mr. Nayampally emailed Mr. Campbell and stated that Novartis now would require that the July medical questionnaire be completed by Ms. Ham's Neuro-Oncologist, Dr. Grommes.  On August 19, 2021, Mr. Campbell submitted the completed July medical questionnaire.  These were the very same accommodations which had been requested in the May 20, 2021 medical questionnaire.  Again, Novartis did not provide Ms. Ham with any of the requested accommodations.

130.    On August 25, 2021, Mr. Nayampally sent Mr. Campbell an email which did not address Ms. Ham's accommodations, but instead sought to justify Novartis' prior notice of termination. By August 25, 2021, Novartis had not responded to Ms. Ham's multiple requests for return-to-work accommodations.

131.    On August 30, 2021, Novartis responded regarding Ms. Ham's return-to-work accommodations, but unreasonably failed to commit to provide the requested accommodations.

132.    Finally, two (2) days later on September 1, 2021, Novartis confirmed that it would grant Ms. Ham's return-to-work accommodations. However, in truth Novartis did not provide the requested accommodations.

133.    That same day, September 1, 2021, Mr. Campbell and Ms. Ham spoke with Mr. Nayampally and Mr. Ace. During this call Mr. Nayampally advised Ms. Ham that she would no longer be reporting to Mr. Aaron, Novartis' Chief Compliance Officer, but to Mr. Ace, Novartis' Executive Director of Policy. Thus, Novartis again retaliated against Ms. Ham by giving her a *de facto* demotion. Ms. Ham was also advised that September 7, 2021 would be her return-to-work date. She also learned that Mr. Aaron left Novartis and that Ms. Kothari was promoted to Novartis' Chief Compliance Officer as of March 2021.

134.    On September 10, 2021, Ms. Ham amended her prior complaint to the Speak Up Office by identifying Ms. Kothari, Mr. Ace, Ms. Beckles, and Mr. Nayampally as individuals who were discriminating and/or retaliating against her.

**Novartis Fails to Provide Ms. Ham with Agreed Upon Accommodations.**

135.    Upon Ms. Ham's return to work, Novartis failed to provide her with the previously agreed upon return-to-work accommodations. As a result, after several weeks, on October 10, 2021, Ms. Ham spoke with Mr. Ace to advise him that the Company was not providing her with

her requested accommodations.  Moreover, Ms. Ham advised Mr. Ace that Mr. Nayampally was doing nothing to address Novartis' failure to provide her with her requested accommodations and that she [Ms. Ham] was being retaliated against for her whistleblowing activities prior to her medical leave.

136.    During this conversation, Mr. Ace claimed that he knew nothing about any accommodations, other than Ms. Ham's need for a larger computer monitor.  Ms. Ham requested that Mr. Ace coordinate with Mr. Nayampally to provide her with the accommodations necessary to do her job.

137.    The next day, October 11, 2021, Ms. Ham spoke with Mr. Ace and Mr. Nayampally about her need for accommodations.  Mr. Nayampally was defensive and argumentative on the call.  During the call, Mr. Nayampally stated that Ms. Kothari was actually the individual who was responsible for Novartis' handling of her requests for accommodations and that she was behind the April 24, 2021 letter of employment termination that was sent to Ms. Ham.

138.    By October 12, 2021, Novartis had still not provided Ms. Ham with her necessary accommodations, and, as a result, she emailed both Mr. Ace and Mr. Nayampally requesting that the Company provide her the necessary accommodations in order to allow her to perform her job duties.  Neither Mr. Ace nor Mr. Nayampally responded to Ms. Ham's request.  Thus, the Defendants failed and refused to engage in the interactive process and failed to accommodate Ms. Ham's disability.

**Novartis Terminates Ms. Ham's Employment.**

139.    On October 12, 2021, after weeks of not hearing back from the Speak Up Office, Maria LaRosa, Global Head of Novartis' Speak Up Office, suddenly contacted Ms. Ham regarding her complaint and attempted to schedule a meeting with two (2) outside counsel for the next day,

October 13, 2021. Ms. LaRosa was very insistent that Ms. Ham speak with outside counsel the very next day. Upon information and belief, Novartis was anxious to "close out" Ms. Ham's complaints prior to her planned termination.

140. On October 14, 2021, Ms. Kothari invited Ms. Ham to a meeting on October 19, 2021 allegedly to "catch-up" with her [Ms. Ham].

141. On October 18, 2021, Ms. Ham participated in the Global Ophthalmology Olympics video call hosted by J. Jill Hopkins, M.D., Novartis' CEO, Global Pharma Head and Global Head Ophthalmology. During the call, Dr. Hill emphasized that Xiidra will continue to be a priority in the United States, not Beovu – the drug to which Ms. Ham had been relegated to support.

142. On October 19, 2021, Ms. Kothari advised Ms. Ham, by email, that her employment was being terminated allegedly as a result of the elimination of her position.

143. Novartis' stated reason for Ms. Ham's termination was false and was a pretext to cover up the true reason for her termination, i.e., retaliation in violation of conscientious Employee Protection Act, N.J.S.A. 39:19-1, *et seq.*, and/or discrimination and retaliation in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.*

144. Novartis' stated reason for Ms. Ham's termination was a pretext because, in truth, Ms. Ham's role of Compliance Advisor for Ophthalmics was not being eliminated but expanded to include Novartis' Respiratory Franchise.

145. Further, Novartis is obligated under the CIAs to maintain a robust compliance program and Novartis did, and continues to, employ numerous employees in compliance roles which Ms. Ham is exceptionally well-qualified to perform.

146.     At and after Ms. Ham's wrongful termination, Novartis did not consider Ms. Ham in good faith for any other compliance positions, and discarded her subsequent applications for transfer/employment in another compliance role, for discriminatory and retaliatory reasons and notwithstanding Ms. Ham's excellent credentials and competencies.

<u>**COUNT ONE**</u>
**(CEPA Retaliation)**

147.     Plaintiff repeats and realleges the allegations set forth above as if set forth at length herein.

148.     <u>N.J.S.A.</u> 34:19-3, states, in pertinent part:

An employer shall not take any retaliatory action against an employee because the employee does any of the following:

a.  Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:

(1)     is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, . . .

(2)     is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity;

c.  Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

(1)     is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, . . .

(2)    is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity.

149.    As set forth at length above, Plaintiff repeatedly disclosed and objected to conduct and proposed conduct by Defendants which she reasonably believed was in violation of a law, rule or regulation and/or which conduct was fraudulent, deceptive and/or criminal, including the Entresto Cardiac Nurse Program, "Sales Guidance on Interactions with Pharmacies" slide deck, and Xiidra Pillpack Agreement.

150.    Plaintiff's disclosures and objections constituted protected whistleblowing activities under CEPA, N.J.S.A. 34:19-3(a)(1); 3(a)(2); 3(c)(1); and 3(c)(2).

151.    Defendants retaliated against Plaintiff by, among other things: subjecting her to bogus internal investigations; falsely criticizing her performance; isolating and marginalizing her; berating and humiliating her; transferring her to less desirable roles; prohibiting her from serving on leadership teams; preventing her from presenting on a project she had spearheaded; giving her a poor 2019 Year-End Performance Evaluation; obstructing her ability to return to work after her leave; failing and refusing to provide her with reasonable accommodations to return to work once she was disabled; and ultimately terminating her employment;

152.    All of the Defendants' actions as aforesaid, including Plaintiff's termination, were in violation of CEPA.

153.    Defendants acted with malice or willful or wanton disregard of Plaintiff's rights in retaliating against her and terminating her employment.

154.    Defendants' actions involved the material and intentional participation of upper management.

155.    Defendants' actions caused Plaintiff to suffer economic, physical and emotional harm.

WHEREFORE, Plaintiff demands judgment against defendants Novartis AG, NPC, Ms. McGee and Ms. Kothari, and each of them, jointly and severally and/or in the alternative, for compensatory damages, liquidated damages, punitive damages, interest, attorney's fees, enhanced attorney's fees, costs of suit, back pay, front pay, compensation for the negative tax consequences of receiving a damage award in the form of a one-time lump sum, and any other relief as is deemed to be just and equitable by the Court.

## COUNT TWO
### (Retaliatory Hostile Work Environment- CEPA)

156.    Plaintiff repeats and realleges the allegations set forth above as if set forth at length herein.

157.    Plaintiff engaged in protected whistleblowing activities as set forth at length above.

158.    Plaintiff was subjected to a hostile work environment by Defendants on the basis of her whistleblowing activities in violation of CEPA.

159.    Defendants' unwelcome conduct as aforesaid was directed toward Plaintiff because of her protected class as a whistleblower and was severe and pervasive enough to change the conditions of her employment and create an abusive environment, whether judged by a subjective or objective standard.

160.    Defendants' harassment and retaliatory actions were severe and pervasive enough to make a reasonable person feel that the conditions of her employment were altered and that the working environment was intimidating, hostile and abusive on the basis of her whistleblowing activity.

161.    Defendants acted with malice or willful or wanton disregard of Plaintiff's rights in retaliating against her and terminating her employment.

162.    Defendants' actions involved the material and intentional participation of upper management.

163.    Defendants' actions caused Plaintiff to suffer economic, physical and emotional harm.

WHEREFORE, Plaintiff demands judgment against defendants Novartis AG, NPC, Ms. McGee and Ms. Kothari, and each of them, jointly and severally and/or in the alternative, for compensatory damages, liquidated damages, punitive damages, interest, attorney's fees, enhanced attorney's fees, costs of suit, back pay, front pay, compensation for the negative tax consequences of receiving a damage award in the form of a one-time lump sum, and any other relief as is deemed to be just and equitable by the Court.

## COUNT THREE
### (Disability Discrimination- NJLAD)

164.    Plaintiff repeats and realleges the allegations set forth above as if set forth at length herein.

165.    N.J.S.A. 10:5-12(a) states, in pertinent part:

It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:

a.  For an employer, because of the . . . disability . . . of any individual, . . . to refuse to hire or employ or to bar or to discharge . . . from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment; . . .

166.    Based upon Plaintiff's cancer diagnosis and treatment, and resulting limitations, she was disabled as that term is defined by the NJLAD, N.J.S.A. 10:5-5(q).

167.     As noted at length above, the Defendants discriminated against Plaintiff because of her disability by among other things: falsely criticizing her performance; isolating and marginalizing her; berating and humiliating her; transferring her to less desirable roles; obstructing her ability to return to work after her leave; failing and refusing to provide her with reasonable accommodations to return to work once she was disabled; and ultimately terminating her employment.

168.     Defendants replaced Plaintiff with a non-disabled employee.

169.     Defendants acted with malice or willful or wanton disregard of Plaintiff's rights in discriminating against her and terminating her employment.

170.     Defendants' actions involved the material and intentional participation of upper management.

171.     Defendants' actions caused Plaintiff to suffer economic, physical and emotional harm.

WHEREFORE, Plaintiff demands judgment against defendants Novartis AG, NPC, Ms. McGee and Ms. Kothari, and each of them, jointly and severally and/or in the alternative, for compensatory damages, liquidated damages, punitive damages, interest, attorney's fees, enhanced attorney's fees, costs of suit, back pay, front pay, compensation for the negative tax consequences of receiving a damage award in the form of a one-time lump sum, and any other relief as is deemed to be just and equitable by the Court.

## COUNT FOUR
### (Retaliation – NJLAD)

172.     Plaintiff repeats and realleges the allegations set forth above as if set forth at length herein.

173.     Plaintiff was disabled as set forth above.

174.    Plaintiff sought and received accommodations for her disability in the form of medical leave; job modification; job restructuring; remote working; reduced schedule; ramp-up period; supplemental breaks; and supplemental equipment (home-work station with monitor, computer, printer).

175.    Defendants retaliated against Plaintiff for requesting and/or obtaining a reasonable accommodation in violation of the anti-reprisal provisions of the NJLAD, N.J.S.A 10:5-12(d).

176.    Defendants acted with malice or willful or wanton disregard of Plaintiff's rights in discriminating against her and terminating her employment.

177.    Defendants' actions involved the material and intentional participation of upper management.

178.    Defendants' actions caused Plaintiff to suffer economic, physical, and emotional harm.

WHEREFORE, Plaintiff demands judgment against defendants Novartis AG, NPC, Ms. McGee and Ms. Kothari, and each of them, jointly and severally and/or in the alternative, for compensatory damages, liquidated damages, punitive damages, interest, attorney's fees, enhanced attorney's fees, costs of suit, back pay, front pay, compensation for the negative tax consequences of receiving a damage award in the form of a one-time lump sum, and any other relief as is deemed to be just and equitable by the Court.

## COUNT FIVE
### (Failure to Accommodate Disability- NJLAD)

179.    Plaintiff repeats and realleges the allegations set forth above as if set forth at length herein.

180.    Plaintiff was disabled as set forth above.

181.    At all relevant times, Plaintiff is and has been able to perform the essential functions of her position as Compliance Advisor with or without a reasonable accommodation, including job restructuring or modification and/or has been able to perform equivalent positions available within Novartis.

182.    Plaintiff requested reasonable accommodations for her disability in the form of: medical leave; job modification; job restructuring; remote working; reduced schedule; ramp-up period; supplemental breaks; and supplemental equipment (home-work station with monitor, computer, printer).

183.    Plaintiff's requested accommodations were reasonable and did not impose an undue burden on Defendants.

184.    Defendants failed to provide Plaintiff with a reasonable accommodation in violation of the New Jersey Law Against Discrimination.

185.    Defendants failed to accommodate Plaintiff in violation of the NJLAD by not providing the agreed upon accommodations and subsequently terminating her employment without considering Ms. Ham for vacant compliance positions for which she was qualified.

186.    Defendants failed to engage in a good faith interactive process to determine whether Plaintiff could be accommodated.

187.    Defendants acted with malice or willful or wanton disregard of Plaintiff's rights in retaliating against her and terminating her employment.

188.    Defendants' actions involved the material and intentional participation of upper management.

189.    Defendants' actions caused Plaintiff to suffer economic, physical and emotional harm.

WHEREFORE, Plaintiff demands judgment against defendants Novartis AG, NPC, Ms. McGee and Ms. Kothari, and each of them, jointly and severally and/or in the alternative, for compensatory damages, liquidated damages, punitive damages, interest, attorney's fees, enhanced attorney's fees, costs of suit, back pay, front pay, compensation for the negative tax consequences of receiving a damage award in the form of a one-time lump sum, and any other relief as is deemed to be just and equitable by the Court.

## COUNT SIX
### (Hostile Work Environment- NJLAD)

190.    Plaintiff repeats and realleges the allegations set forth above as if set forth at length herein.

191.    Defendants created a hostile work environment due to Plaintiff's disability and/or in retaliation for Plaintiff's request for reasonable accommodations for her disabilities, in violation of the New Jersey Law Against Discrimination.

192.    Defendants' unwelcome conduct as aforesaid was directed toward Plaintiff because of her protected class as a disabled person and/or in retaliation for requesting and receiving reasonable accommodations for her disability, and was severe and pervasive enough to change the conditions of her employment and create an abusive environment, whether judged by a subjective or objective standard.

193.    Defendants' harassment and retaliatory actions were severe and pervasive enough to make a reasonable person feel that the conditions of her employment were altered and that the working environment was intimidating, hostile and abusive on the basis of her disability.

194.    Defendants acted with malice or willful or wanton disregard of Plaintiff's rights in retaliating against her and terminating her employment.

195.    Defendants' actions involved the material and intentional participation of upper management.

196.    Defendants' actions caused Plaintiff to suffer economic, physical and emotional harm.

WHEREFORE, Plaintiff demands judgment against defendants Novartis AG, NPC, Ms. McGee and Ms. Kothari, and each of them, jointly and severally and/or in the alternative, for compensatory damages, liquidated damages, punitive damages, interest, attorney's fees, enhanced attorney's fees, costs of suit, back pay, front pay, compensation for the negative tax consequences of receiving a damage award in the form of a one-time lump sum, and any other relief as is deemed to be just and equitable by the Court.

## COUNT SEVEN
### (Aiding and Abetting as to Elizabeth McGee - NJLAD)

197.    Plaintiff repeats and realleges the allegations set forth above as if set forth at length herein.

198.    As set forth above, Defendant McGee aided and abetted Novartis' wrongful termination, harassment, disparate treatment and retaliation against Plaintiff in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12(e).

199.    McGee's actions were motivated by actual malice or were the result of a willful and wanton disregard for the harm their actions were causing Plaintiff.

200.    Novartis AG and NPC have *respondeat superior* liability for McGee's illegal actions.

201.    McGee caused Plaintiff to suffer economic, physical, and emotional harm.

WHEREFORE, Plaintiff demands judgment against defendant Elizabeth McGee, and the other defendants jointly, severally and/or in the alternative, for compensatory damages, liquidated

damages, punitive damages, interest, attorney's fees, enhanced attorney's fees, costs of suit, back pay, front pay, and any other relief as is deemed to be just and equitable by the Court.

## COUNT EIGHT
### (Aiding and Abetting as to Shefali Kothari - NJLAD)

202.     Plaintiff repeats and realleges the allegations set forth above as if set forth at length herein.

203.     As set forth above, Defendant Kothari aided and abetted Novartis' wrongful termination, harassment, disparate treatment and retaliation against Plaintiff in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12(e).

204.     Kothari's actions were motivated by actual malice or were the result of a willful and wanton disregard for the harm their actions were causing Plaintiff.

205.     Novartis AG and NPC have *respondeat superior* liability for Kothari's illegal actions.

206.     Kothari caused Plaintiff to suffer economic, physical, and emotional harm.

WHEREFORE, Plaintiff demands judgment against defendants Novartis AG, NPC, Ms. McGee and Ms. Kothari, and each of them, jointly and severally and/or in the alternative, for compensatory damages, liquidated damages, punitive damages, interest, attorney's fees, enhanced attorney's fees, costs of suit, back pay, front pay, compensation for the negative tax consequences of receiving a damage award in the form of a one-time lump sum, and any other relief as is deemed to be just and equitable by the Court.

## COUNT NINE
### (Individual Liability as to Elizabeth McGee - CEPA)

207.     Plaintiff repeats and realleges the allegations set forth above as if set forth at length herein

208.    Defendant McGee was Plaintiff's employer under N.J.S.A. 34:19-2a.

209.    McGee in her individual capacity, participated in, directed and controlled Novartis' retaliation against Plaintiff such that they are personally liable under CEPA.

210.    Novartis AG and NPC have *respondeat superior* liability for McGee's illegal actions.

211.    McGee caused Plaintiff to suffer economic, physical and emotional harm.

WHEREFORE, Plaintiff demands judgment against defendants Novartis AG, NPC, Ms. McGee and Ms. Kothari, and each of them, jointly and severally and/or in the alternative, for compensatory damages, liquidated damages, punitive damages, interest, attorney's fees, enhanced attorney's fees, costs of suit, back pay, front pay, compensation for the negative tax consequences of receiving a damage award in the form of a one-time lump sum, and any other relief as is deemed to be just and equitable by the Court.

## COUNT TEN
### (Individual Liability as to Shefali Kothari - CEPA)

212.    Plaintiff repeats and realleges the allegations set forth above as if set forth at length herein.

213.    Defendant Kothari was Plaintiff's employer under N.J.S.A. 34:19-2a.

214.    Kothari in her individual capacity, participated in, directed and controlled Novartis' retaliation against Plaintiff such that they are personally liable under CEPA.

215.    Novartis AG and NPC have *respondeat superior* liability for Kothari's illegal actions.

216.    Kothari caused Plaintiff to suffer economic, physical and emotional harm.

WHEREFORE, Plaintiff demands judgment against defendants Novartis AG, NPC, Ms. McGee and Ms. Kothari, and each of them, jointly and severally and/or in the alternative, for

compensatory damages, liquidated damages, punitive damages, interest, attorney's fees, enhanced attorney's fees, costs of suit, back pay, front pay, compensation for the negative tax consequences of receiving a damage award in the form of a one-time lump sum, and any other relief as is deemed to be just and equitable by the Court.

## COUNT ELEVEN
### (Aiding and Abetting as to Novartis AG - NJLAD)

217.    Plaintiff repeats and realleges the allegations set forth above as if set forth at length herein.

218.    At all times relevant, defendant Novartis AG has actual or *de facto* control over the conduct of NPC, McGee and Kothari as it related to Ms. Ham and the unlawful conduct identified above.

219.    At all times relevant, defendant Novartis AG directed, controlled and encouraged Defendants' wrongful termination, harassment, disparate treatment and retaliation against Plaintiff in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12(e).

220.    Novartis AG's actions were motivated by actual malice or were the result of a willful and wanton disregard for the harm their actions were causing Plaintiff.

221.    Novartis AG caused Plaintiff to suffer economic, physical, and emotional harm.

WHEREFORE, Plaintiff demands judgment against defendants Novartis AG, NPC, Ms. McGee and Ms. Kothari, and each of them, jointly and severally and/or in the alternative, for compensatory damages, liquidated damages, punitive damages, interest, attorney's fees, enhanced attorney's fees, costs of suit, back pay, front pay, compensation for the negative tax consequences of receiving a damage award in the form of a one-time lump sum, and any other relief as is deemed to be just and equitable by the Court.

## COUNT TWELVE
### (Liability as to Novartis AG - CEPA)

222.    Plaintiff repeats and realleges the allegations set forth above as if set forth at length herein.

223.    Defendant Novartis AG was Plaintiff's employer under N.J.S.A. 34:19-2a.

224.    At all times relevant, defendant Novartis AG has actual or *de facto* control over the conduct of Defendants as it related to Ms. Ham and the unlawful conduct identified above.

225.    Defendant Novartis AG, participated in, directed and controlled Defendants' retaliation against Plaintiff such that it is separately liable under CEPA.

226.    Novartis AG caused Plaintiff to suffer economic, physical and emotional harm.

WHEREFORE, Plaintiff demands judgment against defendants Novartis AG, NPC, Ms. McGee and Ms. Kothari, and each of them, jointly and severally and/or in the alternative, for compensatory damages, liquidated damages, punitive damages, interest, attorney's fees, enhanced attorney's fees, costs of suit, back pay, front pay, compensation for the negative tax consequences of receiving a damage award in the form of a one-time lump sum, and any other relief as is deemed to be just and equitable by the Court.

BERKOWITZ LICHTSTEIN KURITSKY
GIASULLO & GROSS LLC
Attorneys for Plaintiff

By:  /s/ JOHN MESSINA _____

Dated: June 29, 2023                JOHN MESSINA

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues and claims.

## DESIGNATION OF TRIAL COUNSEL

Plaintiff hereby designates John Messina, Esq. as trial counsel in this matter.

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I HEREBY CERTIFY in accordance with L. Civ. R. 11.2, that, to the best of my knowledge, information and belief, the instant matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding. I am not presently aware of any other parties who should be joined in this action.

BERKOWITZ LICHTSTEIN KURITSKY
GIASULLO & GROSS LLC
Attorneys for Plaintiff

By: ___/s/ JOHN MESSINA_____
    JOHN MESSINA

Dated: June 29, 2023

## CERTIFICATE OF SERVICE

I served a copy of this document on all counsel of record via the Court's ECF system and pursuant to the Federal Rules of Civil Procedure on June 29, 2023.

BERKOWITZ LICHTSTEIN KURITSKY
GIASULLO & GROSS LLC
Attorneys for Plaintiff

By: __/s/ JOHN MESSINA _____
    JOHN MESSINA

Dated:  June 29, 2023